1

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

THOMAS J.  COLLMAN,                )      3:10-cv-00090-LRH (WGC)
                                   )
              Plaintiff,           )      **REPORT AND RECOMMENDATION**
                                   )      **OF U.S. MAGISTRATE JUDGE**
       vs.                         )
                                   )
HOWARD SKOLNIK, et al.,            )
                                   )
              Defendants.          )
_____    )

13    This Report and Recommendation is made to the Honorable Larry R.  Hicks, United

14    States District Judge. The action was referred to the undersigned Magistrate Judge pursuant

15    to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is

16    Defendants' Motion for Summary Judgment. (Doc. # 29.)[1] Plaintiff opposed. (Doc. # 36.)

17    Despite being given an extension to do so, Defendants did not file a reply.  (*See* Doc. # 37, Doc.

18    # 38.) After a thorough review, the court recommends that Defendants' motion be granted in

19    part and denied in part.

20                              **I. BACKGROUND**

21    At all relevant times, Plaintiff Thomas J.  Collman (Plaintiff) was an inmate in custody

22    of the Nevada Department of Corrections (NDOC). (Pl.'s Compl.  (Doc. # 8).) The events giving

23    rise to this action took place at Nevada State Prison (NSP). (*Id.*  at 1.) Plaintiff, a *pro se* litigant,

24    brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants are Howard Skolnik, Donald

25    Helling, William Donat, Greg Smith, and James Baca. (*See* Doc. # 7 at 3, 4; Doc. # 8 at 2-3.)

26    On screening, the court determined that Plaintiff states a colorable claim for denial of

27

28    _____

        [1]      Refers to the court's docket number.

1   his First Amendment right to the free exercise of religion. (Doc. # 7.)  Despite the language of

2   the Screening Order, the court agrees with Defendants that Plaintiff has also clearly stated a

3   colorable claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42

4   U.S.C. § 2000cc-1(a). (*See* Doc. # 29 n. 1; Pl.'s Compl.  (Doc. # 8 at 4, 5, 10-11).)

5       Specifically, Plaintiff alleges that he was denied visits from clergy of his faith, the

6   Philadelphia Church of God (PCG); he was denied full immersion baptism by a minister of his

7   faith; and that has been forced to accept Defendants' religious views and practices because

8   Defendants have failed to act to approve and recognize his sincerely held beliefs. (Doc. # 8 at

9   4-12.) Plaintiff does admit that while originally denied or delayed, he has been allowed visits

10  with a PCG clergy, and has been allowed to be baptized in conformance with his religious

11  beliefs by the proper PCG clergy. (*Id.*)

12      Defendants move for summary judgment, arguing: (1) Defendants have not denied

13  Plaintiff's rights under the First Amendment or RLUIPA; (2) Defendants cannot be sued in

14  their official capacity; (3) Plaintiff has not sufficiently alleged each Defendants' personal

15  participation; and (4) Defendants are entitled to qualified immunity. (Doc. # 29.)

16                                  **II. LEGAL STANDARD**

17      "The purpose of summary judgment is to avoid unnecessary trials when there is no

18  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

19  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

20  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing

21  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate

22  if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

23  there is no genuine issue as to any material fact and that the movant is entitled to judgment as

24  a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the

25  material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S.

26  at 250.

27      The moving party bears the burden of informing the court of the basis for its motion,

28  together with evidence demonstrating the absence of any genuine issue of material fact.

2

1   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

2   in an inadmissible form, only evidence which might be admissible at trial may be considered

3   by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

4          In evaluating the appropriateness of summary judgment, three steps are necessary:

5   (1) determining whether a fact is material; (2) determining whether there is a genuine issue for

6   the trier of fact, as determined by the documents submitted to the court; and (3) considering

7   that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250.

8   As to materiality, only disputes over facts that might affect the outcome of the suit under the

9   governing law will properly preclude the entry of summary judgment; factual disputes which

10  are irrelevant or unnecessary will not be considered. *Id.*  at 248.

11         In determining summary judgment, a court applies a burden shifting analysis.  "When

12  the party moving for summary judgment would bear the burden of proof at trial, 'it must come

13  forward with evidence which would entitle it to a directed verdict if the evidence went

14  uncontroverted at trial.'[ ]  In such a case, the moving party has the initial burden of

15  establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R.*

16  *Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.  2000) (internal

17  citations omitted). In contrast, when the nonmoving party bears the burden of proving the

18  claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence

19  to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

20  nonmoving party failed to make a showing sufficient to establish an element essential to that

21  party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at

22  323-25. If the moving party fails to meet its initial burden, summary judgment must be denied

23  and the court need not consider the nonmoving party's evidence. *See Adickes v.  S.H. Kress &*

24  *Co.*, 398 U.S. 144, 160 (1970).

25         If the moving party satisfies its initial burden, the burden shifts to the opposing party

26  to establish that a genuine issue of material fact exists. *See Matsushita Elec.  Indus.  Co.  v.*

27  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

28  the opposing party need not establish a material issue of fact conclusively in its favor. It is

1   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

2   parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

3   *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The

4   nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

5   that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions

6   and allegations of the pleadings and set forth specific facts by producing competent evidence

7   that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

8       At summary judgment, a court's function is not to weigh the evidence and determine the

9   truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

10  While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

11  drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

12  significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations

13  omitted).

14                              **III. DISCUSSION**

15  **A.  FIRST AMENDMENT**

16      The First Amendment to the United States Constitution provides that Congress shall

17  make no law respecting the establishment of religion, or prohibiting the free exercise thereof.

18  U.S. Const.  amend I. The United States Supreme Court has held that prisoners retain their

19  First Amendment rights, including the right to free exercise of religion. *O'Lone v.  Estate of*

20  *Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted); *Shakur v.  Schriro*, 514 F.3d 878, 883-

21  84 (9th Cir.  2008) (citations omitted); *McElyea v.  Babbitt*, 833 F.2d 196, 197 (9th Cir.  1987)

22  (per curiam) ("The right to exercise religious practices and beliefs does not terminate at the

23  prison door.") (citations omitted).

24      Preliminarily, for the free exercise clause to apply, the inmate must show that his claim

25  involves a sincere religious belief that is consistent with his faith. *See Shakur*, 514 F.3d at 884-

26  85.

27      While prisoners retain their First Amendment right to free exercise of religion, it is well

28  recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of

4

1  many privileges and rights, a retraction justified by the considerations underlying our penal

2  system." *Shakur*, 514 F.3d at 884 (internal quotation marks and citations omitted).

3  Therefore,"[w]hen a prison regulation impinges on inmates' constitutional rights, the

4  regulation is valid if it is reasonably related to legitimate penological interests." *Turner v.*

5  *Safely*, 482 U.S. 78, 89 (1987); *see also O'Lone*, 482 U.S. at 349; *Shakur*, 514 F.3d at 884;

6  *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995); *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th

7  Cir. 1997), *overruled on other grounds in Shakur*, 514 F.3d at 884-85.

8         To determine if a prison regulation is reasonably related to a legitimate penological

9  interest, the court considers the following factors set out in *Turner v. Safely*: (1) whether there

10  is a "'valid, rational connection' between the prison regulation and the legitimate governmental

11  interest put forward to justify it"; (2) "whether there are alternative means of exercising the

12  rights that remain open to prison inmates"; (3) what impact the requested accommodation

13  "will have on guards and other inmates, and on the allocation of prison resources generally";

14  and (4) whether the "absence of ready alternatives is evidence of the reasonableness of a prison

15  regulation" or the existence of obvious alternatives evidences an "exaggerated response."

16  *Turner*, 482 U.S. at 89-90. In evaluating a free exercise claim, courts must give "appropriate

17  deference to prison officials," *O'Lone*, 482 U.S. at 349, because "the judiciary is 'ill-equipped'

18  to deal with the difficult and delicate problems of prison management." *Thornburgh v. Abbot*,

19  490 U.S. 401, 407-08 (1989) (citation omitted).

20         While Defendants point out that Plaintiff previously identified himself as an Odinist,

21  they do not challenge that Plaintiff's claim involves a sincere religious belief that is consistent

22  with his faith. (Doc. # 29 at 7.) Moreover, in his Complaint, Plaintiff asserts that he was

23  introduced to PCG in 2005, and immediately began receiving literature and enrolled in a bible

24  correspondence course. (Doc. # 8 at 7.) The court finds that this is sufficient, as a threshold

25  matter, to implicate the Free Exercise Clause.

26  **B. RLUIPA**

27         RLUIPA provides in relevant part:

28         No government shall impose a substantial burden on the religious exercise of a

5

1
2

person residing in or confined to an institution…even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person

3
4

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

5
6
7
8
9
10
11

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000c-5(7)(A). To establish a RLUIPA violation, Plaintiff bears the initial burden to prove that Defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Once Plaintiff establishes a substantial burden, Defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Id*. at 995. RLUIPA is to be construed broadly in favor of the inmate. *See* 42 U.S.C. § 2000cc-3(g).

12
13
14
15
16
17
18
19
20
21
22
23
24

Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a 'substantial burden,' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 42 U.S.C. § 2000-5(7)(A); however, the burden must be more than an inconvenience. *Navajo Nation v. U.S. Forest Service*, 479 F.3d 1024,1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008) (internal quotations and citations omitted). In fact, RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 706, 725 n. 13 (2005). The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *Navajo Nation*, 479 F.3d at 1033 (internal citations omitted).

25

## C. ANALYSIS

26

### 1. Clergy visits

27
28

In January 2008, Plaintiff contacted PCG about spiritual counseling by a PCG minister.

6

1   (Doc. # 8 at 7.) Plaintiff made contact with the Reno/Carson City representative of PCG, Pastor

2   Charles Wire. (Doc. # 8 at 8, 19.)

3        On May 28, 2008, Plaintiff requested a copy of Administrative Regulation (AR) 719,

4   governing visitation, and NSP's Institutional Procedure (IP) regarding visiting to advise Mr.

5   Wire how to visit Plaintiff. (Doc. # 8 at 9.)  At NSP, Plaintiff requested that he be permitted to

6   have a clergy visit with a minister of his faith. (*Id*.) He then filed grievances regarding visitation

7   by Pastor Wire. (Doc. # 8 at 24-35.) Plaintiff was instructed to submit visiting forms to obtain

8   approval of his visitor. (*Id.* at 25.) He was also informed that while clergy visitors generally

9   need not be placed on the approved visitors list, Plaintiff had to get authorization due to his

10  custody level as a death row inmate. (*Id.* at 32.) While his grievance was denied, Plaintiff was

11  informed that the proper protocol had been followed, and his clergy visit was ultimately

12  approved. (*Id.*, Doc. # 8 at 10.)

13       It is clear that Plaintiff's claim centers on a delay in allowing him clergy visits, as he

14  admits his clergy visits were ultimately approved. (Doc. # 8 at 10.) Plaintiff also asserts that the

15  visits were conducted in the non-contact visiting room, with audio monitors, so that the

16  conversations could be overheard by correctional officers, staff, and other visitors.  (Doc. # 36

17  at 13.)  After reporting the confidentiality issue to Defendants, they allowed the clergy visits to

18  take place in the attorney's conference room. (*Id*.) Plaintiff asserts that they were some visits

19  still took place in the non-contact visiting room.  (*Id*.)

20                    **a.  First Amendment**

21       Defendants assert that there was a legitimate penological reason for the delay in

22  approving the clergy visits because Plaintiff is a death row inmate and is on maximum custody

23  status. (Doc. # 29 at 7.)

24       While Defendants come to the broad conclusion that they did not violate Plaintiff's First

25  Amendment Rights by denying Plaintiff contact clergy visits for a period of time, they do not

26  provide an analysis of the *Turner* factors.  Defendants have not specifically addressed: (1)

27  whether there is a "'valid, rational connection' between the prison regulation and the legitimate

28

7

1  governmental interest put forward to justify it"; (2) "whether there are alternative means of

2  exercising the rights that remain open to prison inmates"; (3) what impact the requested

3  accommodation "will have on guards and other inmates, and on the allocation of prison

4  resources generally"; and (4) whether the "absence of ready alternatives is evidence of the

5  reasonableness of a prison regulation" or the existence of obvious alternatives evidences an

6  "exaggerated response." *Turner*, 482 U.S. at 89-90. Accordingly, the court finds that

7  Defendants have failed to meet their burden and summary judgment should be denied as to

8  Plaintiff's First Amendment claim related to clergy visitation.

9                    **b. RLUIPA**

10      Plaintiff bears the initial burden of establishing that his religious exercise was

11  substantially burdened. 42 U.S.C. § 2000cc-1(a); *Warsoldier v. Woodford*, 418 F.3d at 994.

12  He must show that Defendants imposed a "significantly great restriction or onus" on his

13  religious exercise by denying him confidential clergy visits for a period of time. *Warsoldier*, 418

14  F.3d at 995 (citation omitted).

15      Plaintiff contends that he was denied clergy visitation for approximately four (4)

16  months. (Doc. # 36 at 6.) Clergy visitation was ultimately approved on September 2, 2008.

17  (*Id.*; Doc. # 8 at 36.)

18      Plaintiff does not explain how the denial of clergy visitation for four (4) months

19  substantially burdened the exercise of his religion. Rather, the evidence shows that he was still

20  able to communicate via correspondence with representatives of PCG. (*See* Doc. # 8 at 7-10,

21  19.) Without any evidence to establish that the denial of clergy visitation for four (4) months

22  substantially burdened his religious exercise, Plaintiff has failed to meet his burden under

23  RLUIPA. Therefore, Summary judgment should be granted as to Plaintiff's RLUIPA claim

24  related to clergy visitation.

25                    **2. Full immersion baptism**

26      Plaintiff alleges that after completing PCG lessons on full immersion baptism, he

27  inquired with NDOC's religious staff about performing the baptism at NSP, and was told it

28

                                    8

would not be a problem. (Doc. # 8 at 7, 8.) In January 2008, Plaintiff contacted PCG about baptism**.** (*Id*. at 7.) He contacted PCG about baptism again on May 26, 2008. (*Id*. at 10.) When NSP would not permit the full immersion baptism to take place, Plaintiff initiated the grievance process with respect to the baptism issue. (*Id*. at 10, 44-50.) In response to his grievance, Plaintiff was told that due to his maximum custody death row status, he was precluded any special baptismal service in his current housing unit. (*Id*. at 44-50.)

On October 19, 2008, Plaintiff sent a letter to Warden Donat again requesting a full immersion baptism according to the tenets of his religion. (Doc. # 8 at 51.) Plaintiff sent a similar letter to Warden Smith. (*Id*. at 54.) The matter was referred to the religious review team (which had not yet been created) for assessment. (*Id*. at 55.)

On November 17, 2008, Plaintiff was told by James Baca that he would not be permitted to have a full immersion baptism, and was given alternatives for baptism given Plaintiff's housing assignment as a death row inmate. (Doc. # 8 at 56.)

James Baca sent Pastor Wire a letter on November 21, 2008, informing him that Plaintiff is a death row inmate under maximum custody level and housed in specialized housing based on his sentence and custody level, and therefore, Plaintiff's baptism could not be approved. (Doc. # 8 at 57.) Mr. Baca told Mr. Wire that Plaintiff's baptism could not be approved. (*Id*.)

On March 30, 2009, an attorney for PCG sent a letter to Greg Smith, James Baca, and Don Helling**,** reminding them that Plaintiff's request for the religious review team's approval of his baptism had been pending for six (6) months without any action. (Doc. # 8 at 58-59.) The letter confirmed that a religious baptism by a minister other than a minister of PCG is not recognized as baptism by PCG. (*Id*.)

On April 10, 2009, Don Helling wrote to the PCG's attorney that Plaintiff would be allowed to have a full immersion baptism. (Doc. # 8 at 60.) On April 20, 2009, Plaintiff received his full immersion baptism in the NSP chapel. (*Id*. at 11.)

Plaintiff's claim regarding his baptism also centers on a delay in allowing the full

immersion baptism, as he admits the baptism was eventually performed. (Doc. # 8 at 11; *see also* Doc. # 29-5 (Ex. E).) He asserts that his baptism was delayed for approximately twelve (12) months. (Doc. # 36 at 12.)

### a. First Amendment

Once again, Defendants conclude that the prison regulations alleged to infringe on Plaintiff's exercise of religion were not unreasonable, but fail to provide any analysis under the *Turner* factors. Consequently, the court cannot appropriately evaluate whether the *Turner* factors weigh in Defendants' favor. Having failed to meet their burden, summary judgment should be denied as to Plaintiff's First Amendment claim related to the full immersion baptism.

### b. RLUIPA

Plaintiff asserts that baptism is a mandated central tenet of his faith, which was denied him for approximately twelve (12) months. (Doc. # 36 at 11-12; Doc. # 8 at 10-11, 44.) According to Plaintiff, his faith requires a full immersion baptism for salvation. (Doc. # 8 at 46.) He also appears to maintain that baptism was required to be forgiven for his sins. (*Id.* at 51.)

The court finds that the foregoing sufficiently establishes that the denial of the baptism ritual for approximately twelve (12) months substantially burdened the exercise of his religion.

The burden now shifts to Defendants to prove that the burden furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *See* 42 U.S.C. § 2000cc-1(a); *Warsoldier*, 418 F.3d at 995.

While Defendants conclude that their policies or actions do not constitute a substantial burden on the exercise of Plaintiff's religious beliefs, they wholly fail to address whether the burden furthers a compelling governmental interest and whether it is the least restrictive means of achieving that interest. (*See* Doc. # 29 at 8.) Accordingly, summary judgment should be denied as to Plaintiff's RLUIPA claim related to the full immersion baptism.

///

### 3. Recognition and approval of PCG as a faith group

On August 28, 2008, Plaintiff submitted forms seeking to have PCG recognized as a faith group and included within NDOC's approved list of faith groups. (Doc. # 8 at 11; 62-66.) Plaintiff included a proposed faith group overview describing PCG's diet, holy days, personal and group worship, and personal and group items, approved by a PCG minister. (*Id.* at 63-66.) According to NDOC's Request for Accommodation of Religious Practices form, the prison was supposed to provide a response within 120 days. (*Id.* at 63.)

Receiving no response, Plaintiff initiated the grievance process related to this claim. (Doc. # 8 at 11, 67-61.)  In response, Plaintiff was told that his paperwork had been submitted to Warden Donat to present to the religious review team, which had not yet been officially established. (*Id.* at 67-71.) He was instructed that once the team was established, his request would be acted on. (*Id.*)

Plaintiff asserts that since September 17, 2008, Defendants have failed to recognize his sincerely held beliefs. (Doc. # 8 at 11.)  As a result, he alleges that Defendants have failed to recognize the holy days subscribed to by adherents to PCG; they have failed to provide him with the same menu for Passover (which PCG celebrates) as the Jewish inmates at NDOC ; and has been denied the receipt of communion.  (*Id.* at 12, 73-76; Doc. # 36 at 15.)

Plaintiff maintains that recognition of these tenets is an integral part of his faith.  (Doc. # 8 at 12.)

### A. First Amendment

Defendants are correct that Plaintiff identifies himself generally as a Christian, and specifically, as a member of the PCG faith. (Doc. # 29-3 (Ex. C).)  However, Defendants do not address the fact that Plaintiff's specific faith group recognizes holy days of observance that are not recognized under the general Christian faith group, as well as special dietary concerns for Passover. (*See* Doc. # 8 at 66; Doc. # 29-7 (Ex. G) at 4.)

As with Plaintiff's other claims, Defendants have failed again to set forth any analysis under the *Turner* factors. Instead, Defendants summarily conclude that it is enough that NDOC

1  recognizes Christianity.  (Doc. # 29 at 9.)  Defendants have failed to meet their burden, and

2  therefore summary judgment should be denied as to this claim.

3         **B. RLUIPA**

4         Plaintiff claims that in failing to recognize his faith group, Defendants have failed to

5  recognize holy days subscribed to by adherents to PCG, and provide him with the dietary

6  requirements for Passover, and the receipt of communion. (Doc. # 8 at 12, 73-76; Doc. # 36 at

7  15.) Plaintiff maintains that recognition of these tenets is an integral part of his faith. (Doc. #

8  8 at 12.)

9         The court finds that the foregoing sufficiently establishes that Plaintiff's religious

10  exercise has been substantially burdened.

11         The burden now shifts to Defendants to prove that the burden furthers a compelling

12  governmental interest and is the least restrictive means of achieving that interest. *See* 42 U.S.C.

13  § 2000cc-1(a); *Warsoldier*, 418 F.3d at 995.

14         Once again, Defendants fail to address whether the burden on Plaintiff's religion

15  furthers a compelling government interest and is the least restrictive means of achieving that

16  interest.  Consequently, summary judgment should be denied as to this claim.

17  **D. OFFICIAL CAPACITY DAMAGES CLAIMS**

18         A state official sued in his or her official capacity for *damages* is not  a person subject

19  to suit under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Claims

20  against defendants in their official capacities are actually suits against the entity of which the

21  named defendants are agents. *See Kentucky v. Graham*, 473 U.S. 159 (1985). "As long as the

22  government entity receives notice and an opportunity to respond, an official-capacity suit is,

23  in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. The real

24  party in interest in such suits is the entity itself, and the entity, not the named defendant, will

25  be liable for any damages. *Id.*

26         Defendants' motion for summary judgment should be granted as to Plaintiff's official

27  capacity damages claims.  However, Plaintiff also seeks injunctive and declaratory relief (Doc.

28

12

# 8 at 14), and Plaintiff's official capacity claims may proceed in this regard.

**E. PERSONAL PARTICIPATION**

Defendants argue that Plaintiff has failed to plead that each Defendant violated the Constitution through their own individual actions. (Doc. # 10 at 13.)

A section 1983 plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1948 (2009).

The court notes that this is an argument that should have been raised in a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Nonetheless, after undertaking a thorough analysis of Plaintiff's allegations and the exhibits attached to Plaintiff's Complaint, the court finds that Plaintiff has adequately alleged the personal participation of each Defendant so as to preclude summary judgment on this basis as to all Defendants except Defendant Skolnik.

**1. Defendant Howard Skolnik**

During the relevant time period, Defendant Howard Skolnik was the Director of NDOC. (Doc. # 29 at 2.)

The only mention of Defendant Skolnik in Plaintiff's Complaint is in a letter Plaintiff copied Defendant Skolnik on, dated November 2, 2008, stating that Plaintiff's constitutional rights were being violated in connection with clergy visitation and full immersion baptism. (Doc. # 8 at 34-35.) Simply being copied on a letter one time does not sufficiently tie Defendant Skolnik to the alleged constitutional violations. Therefore, summary judgment should be granted on all claims as to Defendant Skolnik.

**2. Defendant Donald Helling**

Defendant Donald Helling was the Deputy Director of NDOC. (Doc. # 29 at 2.)

Defendant Donald Helling was responsible for responding to Plaintiff's second level grievance related to clergy visitation, which was denied. (Doc. # 8 at 32.)

Defendant Donald Helling also denied Plaintiff's second level grievance related to the

13

baptism issue, stating that his status as a death row inmate precludes the requested baptism. (Doc. # 8 at 50.)

Philip S. Haney, PCG's attorney, sent a letter to Defendant Helling, setting forth the details related to Plaintiff's baptism issue, and requesting an explanation of the status of Plaintiff's request. (Doc. # 8 at 59.) On April 10, 2009, Defendant Helling sent Mr. Haney a letter stating that Plaintiff would be allowed to be baptized through total immersion at NSP. (Doc. # 8 at 60.)  Defendant Smith was to coordinate the event.  (*Id*.)

Defendant Helling also denied Plaintiff's second level grievance related to his request for accommodation of religious practices, stating that the request had been submitted to the religious review team. (Doc. # 8 at 71.)

The court finds that Plaintiff has sufficiently tied Defendant Helling personally to the alleged constitutional violations.

### 3. Defendant William Donat

Defendant William Donat was the former Warden at NSP. (Doc. # 29 at 3.)

Defendant Donat denied Plaintiff's first level grievance related to clergy visitation. (Doc. # 8 at 32.)

Plaintiff copied Defendant Donat on a letter dated November 2, 2008, stating that Plaintiff's constitutional rights were being violated in connection with clergy visitation and full immersion baptism. (Doc. # 8 at 34-35.)

Defendant Donat sent Pastor Wire a letter dated September 2, 2008, indicating that visiting privileges could commence with Plaintiff.  (Doc. # 8 at 36.)  He issued another such memorandum on June 8 ,2009. (*Id.*  at 42.)

Defendant Donat denied Plaintiff's first level grievance related to his full immersion baptism, agreeing with the informal level response which stated that his custody status precluded a baptismal ceremony in the NSP chapel. (Doc. # 8 at 50.)

On October 19, 2008, Plaintiff sent Defendant Donat a letter requesting that he authorize Plaintiff's baptism by a pastor from PCG. (Doc. # 8 at 51.)

1    Plaintiff's request for accommodation of religious practices was sent to Defendant Donat

2   for presentation to the religious review team for review, once established. (Doc. # 8 at 67.)

3    Plaintiff has sufficiently alleged the personal participation of Defendant Donat.

### 4.  Defendant Greg Smith

5    Defendant Greg Smith is the Warden at NSP.  (Doc. # 29 at 3.)

6    Defendant Smith issued a memorandum dated April 16, 2009, concerning Plaintiff's

7   visit with Pastor Wire, to take place in the Unit 12 visiting area, which Plaintiff claims deprived

8   him of confidentiality.  (Doc. # 8 at 41.)

9    Plaintiff sent Warden Smith a letter stating that he had been denied a full immersion

10  baptism for over a year, and requested again that the baptism be permitted. (Doc. # 8 at 54.)

11  Defendant Smith responded to Plaintiff that this matter was referred to the religious review

12  team for assessment, and that he would discuss the matter with Deputy Director Helling. (*Id*.

13  at 55.)

14    Philip S.  Haney, PCG's attorney, sent a letter to Defendant Smith, setting forth the

15  details related to Plaintiff's baptism issue, and requesting an explanation of the status of

16  Plaintiff's request.  (Doc. # 8 at 59.)

17    After the decision was made to allow Plaintiff his full immersion baptism, Defendant

18  Smith was to be in charge of coordinating the event. (*See* Doc. # 8 at 60.)

19    Defendant Smith denied Plaintiff's first level grievance related to his request for

20  accommodation of religious practices. (Doc. # 8 at 71.)

21    Consequently, Plaintiff has sufficiently alleged the personal participation of Defendant

22  Smith.

### 5.  Defendant James Baca

24    Defendant James Baca was an Associate Warden at NSP. (Doc. # 29 at 3.)

25    Plaintiff sent a request to Defendant Baca to get information related to clergy visitation,

26  and in response Defendant Baca stated that the clergy would have to submit visiting forms, and

27  that baptisms are handled either by Chaplain Garcia out of Lovelock Correctional Center (LCC)

28  or by volunteer Chaplain Metcalf at NSP in the unit classification room. (Doc. # 8 at 24.)

1    Plaintiff copied Defendant Baca on a letter dated November 2, 2008, stating that
2 Plaintiff's constitutional rights were being violated in connection with clergy visitation and full
3 immersion baptism. (Doc. # 8 at 34-35.)

4    In his informal level grievance attached to his Complaint, Plaintiff asserts that
5 Defendant Baca denied him the opportunity to be baptized by a PCG pastor in accordance with
6 his faith. (Doc. # 8 at 44.)

7    Defendant Baca wrote Plaintiff on November 17, 2008, stating that he would not be
8 authorized to have a full immersion baptism in the NSP chapel due to his death row status.
9 (Doc. # 8 at 56.)

10    Defendant Baca also sent Pastor Wire a letter on November 21, 2008, stating that
11 Plaintiff would not be approved for baptism in the NSP chapel.  (Doc. # 8 at 57.)

12    Philip S. Haney, PCG's attorney, sent a letter to Defendant Baca, setting forth the details
13 related to Plaintiff's baptism issue, and requesting an explanation of the status of Plaintiff's
14 request.  (Doc. # 8 at 59.)

15    Plaintiff submitted two requests for recognized holiday service related to his religion,
16 which were denied by Defendant Baca. (Doc. # 8 at 73-74.) Plaintiff asserts that since
17 September 17, 2008, Defendants have failed to recognize his sincerely held beliefs.  (Doc. # 8
18 at 11.)

19    The court finds that Plaintiff has sufficiently alleged the personal participation of
20 Defendant Baca.

21 **F.  QUALIFIED IMMUNITY**

22    Defendants argue that they are entitled to qualified immunity because none of them
23 could have reasonably known that their conduct violated established statutory or constitutional
24 rights because Plaintiff's religious requests were accommodated upon Plaintiff following the
25 proper procedure, and as soon as reasonably possible. (Doc. # 29 at 11.)

26    "[Q]ualified immunity protects government officials from liability for civil damages
27 insofar as their conduct does not violate clearly established statutory or constitutional rights
28 of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S.

Ct. 808, 815 (2009) (citation and internal quotations omitted).  Under certain circumstances, state officials are entitled to qualified immunity when sued in their personal capacities. *Carey v. Nev.  Gaming Control Bd.*, 279 F.3d 873, 879 (9th Cir.  2002). When a state official reasonably believes his or her acts were lawful in light of clearly established law and the information they possessed, the official may claim qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam); *Orin v.  Barclay*, 272 F.3d 1207, 1214 (9th Cir.  2001). Where "the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v.  Katz*, 533 U.S. 194, 202 (2001), *abrogated on other grounds in Pearson v.  Callahan*, 555 U.S. 223 (2009) ("while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").

In analyzing whether a defendant is entitled to qualified immunity, the court must consider two issues.  The court must determine whether the plaintiff alleges a deprivation of a constitutional right, assuming the truth of his factual allegations, and whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241 (2010) (citation and internal quotation marks omitted).  "Whether a right is clearly established turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.*  (citation and internal quotation marks omitted).

First, the court finds that under the facts alleged by Plaintiff, he has stated colorable claims for violation of the First Amendment and RLUIPA.

### 1. Clergy visitation

With respect to Plaintiff's First Amendment claim related to clergy visitation, Defendants do not address Plaintiff's allegation that even when the visits were allowed, they were not confidential. In addition, while Defendants conclude that Plaintiff was accommodated with respect to clergy visitation upon completing the proper procedure, they do not provide evidence in the form of a declaration from each defendant asserting that he reasonably believed that his acts were lawful in light of clearly established law and the information he possessed.

17

While Defendants may be entitled to qualified immunity with respect to the clergy visitation claim, they have not properly supported their request with evidence allowing the court to make such a determination. Therefore, Defendants are not entitled to summary judgment on the basis of qualified immunity with respect to Plaintiff's First Amendment claim related to clergy visitation.

### 2. Full immersion baptism

While Defendants conclude that Plaintiff's requests were accommodated upon Plaintiff following the proper procedure, this is not entirely accurate. It does not appear that the eventual acquiescence related to Plaintiff's full immersion baptism was related to his following any set procedure. Rather, it appears that once PCG's legal counsel made the request, the prison decided to go along with it, albeit approximately a year after Plaintiff initiated the request. Therefore, the court cannot conclude that Plaintiff's request for a full immersion baptism was accommodated upon Plaintiff following the proper procedure. Nor can the court conclude that he was accommodated as "soon as reasonably possible," as Defendants' suggest. Therefore, defendants are not entitled to summary judgment on this basis on Plaintiff's First Amendment and RLUIPA claims related to the full immersion baptism.

### 3. Failure to recognize PCG as a faith group

Defendants also wholly failed to address the fact that Plaintiff's request for religious accommodation is still outstanding in connection with their qualified immunity argument. Accordingly, summary judgment should not be granted on the basis of qualified immunity with respect to Plaintiff's First Amendment and RLUIPA claims related to the failure to recognize his faith group.

///
///
///
///
///
///

18

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING IN PART AND DENYING IN PART** Defendants' Motion for Summary Judgment (Doc. # 29), as follows:

(1) Summary Judgment should be **GRANTED** as to:

    (a) Plaintiff's RLUIPA claim related to clergy visits;

    (b) all claims asserted against Defendant Skolnik; and

    (c) Plaintiff's official capacity damage claims.

(2) Summary judgment should be **DENIED** as to:

    (a) Plaintiff's First Amendment claim related to clergy visits;

    (b) Plaintiff's First Amendment claim related to full immersion baptism;

    (c) Plaintiff's RLUIPA claim related to full immersion baptism;

    (d) Plaintiff's First Amendment claim related to the failure to recognize his faith group; and

    (e) Plaintiff's RLUIPA claim related to the failure to recognize his faith group.

The parties should be aware of the following:

1.    That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: January 26, 2012

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE